States v. Lovelace and Schneider. States v. Lovelace, United States v. Schneider, United States v. Lovelace, United States v. May it please the Court, Counsel. I represent the appellant, David Brock Lovelace, and he was the subject of a grand jury investigation in which some very astonishing propositions were presented to the grand jury. Medicare fraud case, the two primary propositions that were presented to the grand jury were that he had patients traveling from South Florida to Lakeland or to Tampa, Florida to receive testing, a variety of diagnostic tests. And of course the suggestion was that no one in their right mind would travel from Miami to Lakeland or Tampa to receive this diagnostic testing and that therefore a fraud must have been committed by Mr. Lovelace. Mr. Lovelace owned the two corporations that were doing the diagnostic billing to Medicare. The second proposition that was presented to the grand jury to obtain the indictment is that he was also billing for dead beneficiaries. And obviously that caused outrage and clearly indicated that Mr. Lovelace was committing Medicare fraud. But wasn't there more than that? I mean, weren't there also claims being submitted on behalf of doctors who testified that they did not treat these patients or see these patients that, you know, these treatments never occurred? I mean, wasn't there more than what you've just described? It is our position that those were two primary reasons for indictment. However, to answer the court's question, Medicare has different ways that billing can occur. And the billing that Mr. Lovelace was doing was as a group practice. So the bills were coming from Cornerstone or from Summit. And they were for diagnostic testing that was being done and, according to the codes, can be done by a qualified technician. The role of the doctors was to read the testing and to provide the results. There were a number of three or four doctors that came to trial. Each one of them was under contract with Mr. Lovelace and was receiving a substantial amount of money, $50,000 to $80,000 a year, for the purpose of reading these diagnostic tests. So there was confusion about what the doctors' responsibilities were. According to the way that Cornerstone and Summit were billing, they were billing for the diagnostic testing done by a technician and then the reports to be read by a doctor. The doctors came to court and testified that they, in fact, had received their payment, their contract payment. They didn't have any personal relationship with any of the patients because they never saw any of the patients. The diagnostic testing was done by a technician. They were astounded in trial that they were being told that they had read thousands of reports. But the way the evidence was presented in trial, if, for example, you had an echocardiogram, and if that bill was submitted and rejected and resubmitted and rejected and resubmitted and rejected, as we saw the evidence in trial, many times one service was submitted and rejected, six or seven times, the prosecution presented that that doctor would have performed that service the six times that the claim was presented. So that's why the numbers were so large. In reality, that number could be, it was a fraction of that number because of the fact that the doctor was being asked in court, well, how many times did you see or read this report? And he would say, well, gosh, I never looked at 3,000 reports. But why couldn't a reasonable jury, after hearing all of the evidence, conclude that your client had engaged in fraud by submitting things on behalf of doctors who testified, we didn't do all of this? The doctors testified that they did not do the quantity, and they were offended that they had not gotten paid large amounts of money when they were being presented with the idea that 3,000 claims had been presented with their provider information. And that number was tremendously inflated by the government. And we made every attempt to try to point that out. I guess I understand what your position is, and I think based on your position, a jury could have decided it wanted to acquit your client. But why wasn't it reasonable for a jury to draw the other position from the evidence? We did not have the information that the government did know that those patients never traveled. We knew that that's not what we had submitted. And I don't know if the court knows the history, but I was local counsel in mid-September, and then the person that was going to try the case, the case was set for October 7th. And the person that was supposed to try the case filed a motion on October 5th saying he could not come. So I became it. So I did the best that I could, but there were 32,000 claims, and Judge Maraday gave us an additional six weeks to get ready. So we knew there was something wrong with the billing, but the government knew that each one of those people had been treated in South Florida, as opposed to what they presented to the grand jury that they were traveling to Lakeland and Tampa. And the reason why they knew is when the claims had been submitted, they had been paid at the Dade County rate, which is a few dollars higher than the Tampa rate. But that was never disclosed, even though we continued to ask, can you give us the original claims data? And the original claims data was what would have been submitted to Medicare by Mr. Lovelace's companies. But how do you meet the criteria for newly discovered evidence? How is this not a lack of due diligence? Mr. Burns is going to, we've kind of divided up that work, but it wasn't available to us. The only thing we could have done is to do that extensive investigation that was later done by the Diaz group as part of the motion for new trial. And we just didn't have the time to be able to find all those beneficiaries. And the government had that right in their hands. They knew that the amount had been paid as a Dade County service, so they knew that the claim that had been presented as a service location being South Florida, because that's how they paid it. But that was not disclosed to us. And my client kept saying, I know I didn't bill for services in Tampa or Lakeland. We brought in the billing expert to say that he put in the service location, but we just did not have a way of proving it. Thank you. You've saved some rebuttal time. Yes, sir. Mr. Burns. Good morning, Your Honors, and may it please the Court. I'm Thomas Burns, and I represent Dr. Schneider. Let's talk about sufficiency of the evidence and the motion for new trial. On sufficiency, we're talking about three counts, counts 20, 21, and 22, and that's patients AA, LL, and BP. Now, we acknowledge that the evidence on the other counts is sufficient. We're just talking about those three counts. And there were six theories of prosecution, Judge Rosenbaum, as you'd indicated before, dead patients, services never rendered, services that were not medically necessary, services that were based on kickbacks, forged reassignments from doctors, and then the wrong address listed on the claims. So there's three ways that we've got to break this down to look to see if any of those theories actually tags my client for these particular convictions. The first is if you just look at those first five things, this is kind of the classic issue in a sufficiency case where you've got to look at whether it's a reasonable inference from circumstantial evidence or an impermissible speculation. The government and we agree that there's no direct evidence that for these three patients that they were dead, the services were never rendered, that they were not medically necessary, that they were based on kickbacks, or that they were forged reassignments because these were services that were provided by Dr. Schneider herself. So then we just have to look at the circumstantial evidence, and our position is, well, that's impermissible. Here it's impermissible speculation. But you do this all the time, so I really don't need to explain that part of the case. There's an additional argument that the government raises, second part of this, where they say, well, these are coastal claims, and because they're coastal claims and because Dr. Schneider had previously misrepresented in her application to make Coastal a Medicare provider or a Medicare entity, all of the claims that were submitted by Coastal were fraud, Medicare fraud. And we say, no, that's a misreading of United States against Medina, so you'll need to look at the case and see who's correct about that. Our position is that the difference between our case and Medina is that Medina involved a charge that that was the misrepresentation. Here the charges pertain to the specific claims that were submitted. So that's the difference and why you can't get us for those convictions. And then the sixth basis was that we had the wrong address on the claims, and our position is that that's not materially false within the meaning of the Medina case, and it's also not something that defrauded the government of anything because what would happen, you would just say, well, you got the wrong address, give us the right address. And here, if the services were medically necessary and they were actually provided, essentially no harm, no foul. I wanted to point out there's a little bit of a practical significance to why these three counts should be reversed. It has to do with the sentence package doctrine and the special assessments. If she gets these convictions reversed, that's $300 back to her. That's a practical significance to her. And then also, if she were resentenced on remand, the district court could consider any post-sentencing rehabilitation so she might get a different sentence. Now, on the motion for new trial, our position, we had adopted the arguments of Mr. Lovelace, but we also said, well, you should have had an evidentiary hearing, and here it looks like there's two bodies of case law. There's some case law that's helpful to us and some case law that's not helpful to us. The helpful cases are United States against Culliver, United States against Gates, and United States against Jernigan, and those ones seem to indicate that a hearing is mandatory. But the unhelpful body case law, some of which I had identified and some of which the government had identified, said no, it's within the discretion of the district court to have a hearing or not. Ordinarily, you would apply the prior panel precedent rule when you've got that kind of conflict, and the earliest case that we saw was United States against Hamilton, Fifth Circuit, 1977, and that's one of the cases that says it's within the district court's discretion whether or not to have the hearing. The alternative would be if you were to reconcile these cases. I don't know how they can be reconciled. They seem inconsistent to me, but perhaps when you write your opinion, you could address that issue and see what these cases mean. So that's our case, unless you had any further questions. I think we understand your point. Thank you. Mr. Tandy. Thank you. Good morning, Your Honors. May it please the Court, John Taddy for the United States. I'd like to address the sufficiency claim first. As Mr. Burns pointed out, the government's primary argument is that under United States versus Medina, this Court in that case held that evidence of kickbacks alone is sufficient to prove health care fraud if the defendant was involved in paying kickbacks before she registered a health care provider, and then that pattern of kickbacks continued. That was the holding in that case with respect to one particular defendant. It related to substantive health care fraud counts, not a conspiracy, and the pattern of facts in this case fits the same paradigm as that case. It's undisputed that Ms. Schneider paid kickbacks to Cornerstone patients before she later registered Coastal. When she registered Coastal, like the defendant in Medina, she promised that she would not violate the anti-kickback statute and pay kickbacks. It's also undisputed that the pattern of kickbacks that were paid in relation to Coastal patients continued through the summer and fall of 2013, which is when the claims in Counts 20, 21, and 22 were submitted. As that pattern of kickbacks continued, the government's position is that under United States versus Medina, there was sufficient evidence to convict the defendant. But even if this Court does not pursue that legal reason for upholding the defendant's three convictions, there was myriad evidence to support the conclusion that the jury reached, and that conclusion needs to be considered in the light most favorable to the prosecution, that Ms. Schneider either did not actually render those services herself, that they were based on illegal kickbacks, that they weren't medically necessary, that they didn't actually occur in Melbourne, Florida, where Coastal was supposedly located. Doctors Newman and Ramos, who were the two other doctors that were the basis for the Coastal claims, testified that they didn't see any of the more than 1,000 patients or, Bill, any of the 7,000 claims that were submitted in their names for Coastal. Dr. Schneider and Mr. Lovelace discussed putting a sign outside Coastal's offices in Melbourne to make it appear as if it was a real clinic in the event someone drove by. There was additional evidence that any services that Dr. Schneider rendered for Coastal, particularly those having to do with vestibular evaluations, which was what was billed for in Counts 20 for 22, either didn't occur or weren't medically necessary. Her and Dr. Lovelace discussed falsifying basic vestibular evaluations. On July 12, 2013, she texted Mr. Lovelace, and this is right before the date of submission for Count 20, which was on July 22nd of 2013, I'm willing to give up $2,000 to $3,000 a week if they, meaning the technicians at Murphy in South Florida, are willing to write dizzy VNG in the chart on 40 to 50 patient notes a week. She also talked about working these oldies as much as you possibly can and say, I'm worried about your brain function. Those are references to false tests for vestibular evaluations for audiology tests. Furthermore, as Ms. Brewer noted, all of these patients were located in South Florida, and the government's exhibits that indicate the addresses of these three particular victims in this case, Aronofsky, Linacero, and Planas, indicate that they all live in Miami. It's irrational to conclude that they would drive up the coast to Melbourne, Florida, for what is a basic medical test. The only reasonable conclusion is that if these tests were taking place, they were taking place at Murphy, and they were medically unnecessary as the three government witnesses who ran the Murphy clinic testified, saying that it was basically a factory for illegitimate billing for unnecessary tests that would just result in the highest billables they could possibly produce. So when you take all of that evidence together, it was certainly reasonable for the jury to conclude, based on all of this circumstantial evidence, that these particular counts were based on either illegitimate billing or services that were not rendered, and therefore this court should affirm those three verdicts. Turning to the allegations of falsified Medicare data, I think it's first important to consider the context that these claims are being raised. First, with respect to Ms. Brewer's argument, there is no sufficiency claim here. This claim is raised as an appeal of the district court's denial of a motion to dismiss the indictment. As this court has held, dismissal is an extreme sanction, and it's only favored in the most egregious cases. There's no allegation that Special Agent Bledsoe, or there's no evidence to support any allegation that Special Agent Bledsoe, who is the agent who testified, deliberately provided incorrect or misleading evidence to the grand jury. For one, this court has held in Flanders that appendant juries across the board, guilty verdict in this case, demonstrates that there was probable cause to charge the defendants with the offenses and that any allegations of misconduct before the grand jury were harmless. So this court could resolve that claim just solely on that basis. Also at trial, the government's expert witness, Stephen Kendoza, who's testified many times in district court, and has been the focus of a lot of this court's opinions as a Medicare expert. He was qualified as a Medicare expert. There was no objection to his qualification as an expert at trial. Talked about how he took the Medicare data specifically from the Medicare contractor, First Coast Service Options, that it was read only, so there's no evidence to support the concept that this was false or fabricated Medicare data. As the district court held when it denied the motion to dismiss the indictment, this was simply a disagreement over the interpretation of evidence, a question of fact that fell within the province of the jury. Finally, with respect to the motion for a new trial, again, much of this evidence goes down to the exact same argument that has been presented throughout this entire case by Mr. Lovelace, that somehow the data that the government submitted was false or fabricated. And there is one thing that I do want to correct that was said, which is that they didn't have the opportunity, and I think this was elicited by Judge Branch's question, that they didn't have the opportunity to contact these individuals earlier. That is false. As the government stated in its response for the motion for a new trial, interviews of patients and beneficiaries or the documents from the Florida Office of Vital Statistics for the death records were turned over a year and a half to counsel. They had the opportunity to track down any of these people or next of kin and get any information that they desired from them. They also submitted hundreds of pages of medical records that related to these particular individuals at trial. By they, I mean Mr. Lovelace submitted that evidence. It simply was not true that they didn't have the opportunity to conduct these investigations, and therefore they fail the very first prong of a motion for a new trial, which is that this evidence has to be new. And the government's position, as the district court found, is that the motion wasn't even timely as a result. You only have 14 days to file a motion for a new trial based on insufficient evidence. This was a motion filed more than a year later based on repackaged claims that had been presented to the court, district court time and again, had been presented to the jury, and the jury necessarily rejected through its verdict. And unless this court has any other questions, we would urge you to affirm the judgment of the district court. Thank you. Thank you. Mr. Barrow. Just a couple of things in rebuttal. We did object to Mr. Quindoza testifying as an expert with regards to codes, and Judge Maraday ruled that because he was so familiar with Medicare, and Medicare payment would necessarily involve codes, that he was going to overrule that objection. As far as time to interview, Your Honor, I did not have time to interview anyone. We started six weeks after. I felt very comfortable becoming a local counsel. I had been practicing 25 years, and I had had many fraud cases, including two Medicare fraud cases. And the lawyer that was going to do the trial was a relative of Mr. Lovelace, so I felt very comfortable that he was going to do the best that he could, and I was going to be around for whatever needed to be done. When we had the six-week period of time and the 32,000 claims to look at, it was just physically impossible. And I filed, I think, at least two more motions, just asking for more time that I would like to be able to do some of those things. And I did not have the opportunity to do that. However, Your Honor, when Mr. Quendoza did testify, he said that the claims data that he was presenting was complete and that part of what had to be put in the Medicare claim form was a required place of where the service had occurred. And he talked about reimbursement codes and how they were different for Dade County as opposed to Tampa. And he still testified that from what he could see, the people were traveling from Dade County to Tampa or Lakeland to receive the services. So as a Medicare expert and having available what was paid for these tests, it is our position that he deliberately misled the jury into thinking that these patients had traveled this distance. And it's clear that from everything that is in evidence that they were paid, the claims that were paid were paid at the South Florida rate and not at the Lakeland-Tampa rate. Thank you. Thank you. Mr. Brown. Your Honor, just a couple of points. On Medina, the difference, like I said, which the government didn't, I think, address, was that that involved a charge where they said the misrepresentation was the application. Here, they're saying it's the claims themselves. And that's what we're saying is different. And an authority that you can look at for that proposition, although it's in the wire fraud context, or, yeah, wire fraud context, is the Tackle Law decision. I cited the initial Tackle Law decision, but there's a rehearing opinion where they basically say if there's a disconnect between the charges and the verdict, you should reverse that conviction. And then in terms of the circumstantial evidence, we're really saying you proved this set of crimes, but it doesn't necessarily mean that we did these crimes. And that's why that circumstantial evidence is insufficient. There's been some talk about the newly discovered evidence test on the motion for a new trial. If you look at the record, the prior trial lawyer had a mental breakdown. A lot of that stuff is under seal, but he had a mental breakdown. And then Ms. Barrow was put in this very difficult circumstance where it's like, well, you haven't been in the first chair, but now you were second chair, but now you're first chair here. Have a very complicated Medicare fraud trial in a month. And then there was like a short extension. So she really didn't have an opportunity to find this stuff until the investigators looked for it. So we ask that you reverse or vacate in remand. Thank you. Thank you, Mr. Burns. Ms. Barrow, you're both court appointed, and we appreciate your having to take the assignment. Yellow fin, locked.